STATE OF MINNESOTA                          DISTRICT COURT
COUNTY OF HENNEPIN                   FOURTH JUDICIAL DISTRICT

|  | Personal Injury |
|---|---|
| JOHN JALILI, | |
| Plaintiff, | **SUMMONS** |
| v. | |
| 3M COMPANY and AEARO TECHNOLOGIES LLC, | |
| Defendants. | |

THIS SUMMONS IS DIRECTED TO:     3M Company

1. **YOU ARE BEING SUED.** The Plaintiff has started a lawsuit against you. The Plaintiff's Complaint against you is attached to this Summons. Do not throw these papers away. They are official papers that affect your rights. You must respond to this lawsuit even though it may not yet be filed with the Court and there may be no court file number on this Summons.

2. **YOU MUST REPLY WITHIN 21 DAYS TO PROTECT YOUR RIGHTS.** You must give or mail to the person who signed this Summons a written response called an Answer within 21 days of the date on which you received this Summons. You must send a copy of your Answer to the person who signed this Summons located at:

   Schwebel Goetz & Sieben
   5120 IDS Center
   80th S. 8th Street
   Minneapolis, Minnesota 55402

3. **YOU MUST RESPOND TO EACH CLAIM.** The Answer is your written response to the Plaintiff's Complaint. In your Answer you must state whether you agree or disagree with each paragraph of the Complaint. If you believe the Plaintiff should not be given everything asked for in the Complaint, you must say so in your Answer.

1

4. **YOU WILL LOSE YOUR CASE IF YOU DO NOT SEND A WRITTEN RESPONSE TO THE COMPLAINT TO THE PERSON WHO SIGNED THIS SUMMONS.** If you do not Answer within 21 days, you will lose this case. You will not get to tell your side of the story, and the Court may decide against you and award the Plaintiff everything asked for in the Complaint. If you do not want to contest the claims stated in the Complaint, you do not need to respond.  A default judgment can then be entered against you for the relief requested in the Complaint.

5. **LEGAL ASSISTANCE.** You may wish to get legal help from a lawyer.  If you do not have a lawyer, the Court Administrator may have information about places where you can get legal assistance.  **Even if you cannot get legal help, you must still provide a written Answer to protect your rights or you may lose the case.**

6. **ALTERNATIVE DISPUTE RESOLUTION.** The parties may agree to or be ordered to participate in an alternative dispute resolution process under Rule 114 of the Minnesota General Rules of Practice.  You must still send your written response to the Complaint even if you expect to use alternative means of resolving this dispute.

<u>**ACKNOWLEDGMENT**</u>

The undersigned acknowledge sanctions may be imposed under Minn. Stat. § 549.211.

Dated: 03/15/2022

**SCHWEBEL GOETZ & SIEBEN, P.A.**
*/s/ Alicia N. Sieben*
William R. Sieben (#100808)
Alicia N. Sieben (#389640)
Matthew J. Barber (#397240)
5120 IDS Center
80 South Eighth Street
Minneapolis, Minnesota 55402-2246
Telephone:  612-377-7777
Fax: 612-333-6311 [1]
bsieben@schwebel.com
asieben@schwebel.com
mbarber@schwebel.com

Respectfully Submitted,

**PAUL LLP**
Richard M. Paul III (*pro hac forthcoming*)
Ashlea G. Schwarz (*pro hac forthcoming*)
601 Walnut Street, Suite 300
Kansas City, Missouri 64106
Telephone: (816) 984-8100
Rick@PaulLLP.com
Ashlea@PaulLLP.com

**GUSTAFSON GLUEK PLLC**
Daniel E. Gustafson (#202241)
Amanda M. Williams (#341691)
120 South 6th Street, Suite 2600
Minneapolis, Minnesota 54402
Phone: 612-333-8844
dgustafson@gustafsongluek.com
awilliams@gustafsongluek.com

**ATTORNEYS FOR PLAINTIFFS**

3

| STATE OF MINNESOTA | DISTRICT COURT |
|---|---|
| COUNTY OF HENNEPIN | FOURTH JUDICIAL DISTRICT |

| | Personal Injury |
|---|---|
| JOHN JALILI, | |
| Plaintiff, | **COMPLAINT** |
| v. | |
| 3M COMPANY and AEARO TECHNOLOGIES LLC, | |
| Defendants. | |

Plaintiff brings this action against defendants 3M Company and Aearo Technologies LLC, and in support thereof allege:

### NATURE OF THE CASE

1. This is a failure to warn product liability action related to an earplug manufactured and sold by Defendants. Plaintiff used Defendants' dual-ended Combat Arms™ Earplugs - Version 2 and, as a result of Defendants' failure to warn, now suffers from hearing loss and tinnitus. Defendants knew the earplugs needed to be inserted in a particular manner in order to have any effectiveness. But the Defendants failed to warn potential purchasers of the danger of failing to do so.

### JURISDICTION AND VENUE

2. This Court has subject matter jurisdiction over Plaintiff's claims under Minn. Stat. § 484.01, subd. 1.

3. This action is not removable to federal court because Plaintiff asserts no claim arising under the Constitution, law, or treaties of the United States to satisfy 28 U.S.C. § 1331 and because even though the requirements of 28 U.S.C. § 1332(a) may be met, Plaintiff brings this suit in Defendants' home state and therefore 28 U.S.C. § 1441(b)(2) precludes removal.

4. Venue is proper in Hennepin County, Minnesota under Minn. Stat. §§ 542.01 and 542.09 because 3M resides in Hennepin County in that it has its resident agent, an office, and a place of business in Hennepin County.

PARTIES

5. Plaintiff John Jalili is an individual residing in the state of Texas.

6. Defendant 3M is a Delaware corporation with its principal place of business in Minnesota.

7. Defendant Aearo Technologies LLC is a limited liability company formed in Delaware with its principal place of business in Minnesota.

FACTUAL ALLEGATIONS

**A. Plaintiff's Use of 3M Combat Arms™ Earplugs Version 2**

8. Plaintiff Jalili worked as a civilian contractor for K.B.R., Inc. from approximately 2003 to 2005. His responsibilities included operating and being near loud generators.

9. Plaintiff Jalili wore the 3M dual-ended earplugs during his employment. During such times, Plaintiff Jalili was exposed to damaging, loud impulse, high-pitched sounds.

2

10. Plaintiff Jalili did not receive instructions to fold back the third flange on the opposite side of the use end of the 3M dual-ended earplugs or a warning that the earplug would not be effective if he did not do so.

11. Prior to his use of the 3M dual-ended earplugs, Plaintiff did not suffer from hearing loss.

12. Plaintiff suffers from hearing loss.

**B.  Defendants' Manufacture and Testing of the Combat Arms™ Earplugs**

13. Aearo Technologies was the global market leader in hearing and eye protection and was based in Indianapolis, Indiana. Aearo Technologies developed, marketed, and sold the Combat Arms™ earplug until being acquired by 3M in 2008 for $1.2 billion. Afterwards, 3M hired Aearo's employees and maintains it as a separate operating unit. Post-acquisition, the Combat Arms™ earplugs have been marketed and sold under the 3M brand. Because 3M acquired both the assets and liabilities of Aearo, Aearo and 3M are used interchangeably and all allegations against Aearo are directed as a matter of law against 3M.

14. Aearo developed dual-ended, non-linear (selective attenuation) Combat Arms™ earplugs for the specific purpose of providing a single set of earplugs that provide two options for hearing attenuation depending on how they are worn:

3



15. The earplugs can be worn in an open or "unblocked" position (yellow end in) to block, or at least significantly reduce, loud impulse sounds, while still allowing the user to hear quieter noises. Alternatively, the earplugs can be worn in a closed or "blocked" position (green end in) to block, or at least significantly reduce, all sounds, i.e., operate as ordinary earplugs.

16. Defendants knew these earplugs, at a minimum, required special instructions for use as early as 2000.

17. At all relevant times, the Combat Arms™ earplugs had a tendency to imperceptibly loosen in the wearer's ear, thus allowing damaging sounds to enter the ear canal around the outside of the earplug. Specifically, the basal edge of the third flange of the non-inserted end of the earplug is prone to press against some wearers' ear canals

and fold back to its original shape, thereby loosening the seal in their ear canals. Because

the earplug is symmetrical, this occurs regardless of which end is inserted into the ear.

18. Aearo learned of this problem when it completed testing of the Combat Arms™

earplugs. In fact, in February 2000, after the Combat Arms™ earplugs failed specification

testing, Aearo employees rolled back the non-inserted yellow flanges to mitigate the

loosening effect.

19. The value and effectiveness of earplugs has been standardized under federal law

through a Noise Reduction Rating ("NRR"). The testing and labeling of earplugs such as

the Combat Arms™ earplugs to achieve an NRR is governed by federal regulations

promulgated by the Environmental Protection Agency ("EPA") pursuant to the Noise

Control Act, 42 U.S.C. § 4901 *et seq.* Specifically, 40 C.F.R. § 211.206-1 provides:

> The value of sound attenuation to be used in the calculation of the Noise
> Reduction Rating must be determined according to the "Method for the
> Measurement of Real-Ear Protection of Hearing Protectors and Physical
> Attenuation of Earmuffs." This standard is approved as the American
> National Standards Institute Standard (ANSI-STD) S3.19-1974.

20. Further, 40 C.F.R. §211.204-4(e) requires that specific supporting information

accompany hearing protection devices sold in the United States:

> The following minimum supporting information must accompany the
> device in a manner that insures its availability to the prospective user. In
> the case of bulk packaging and dispensing, such supporting information
> must be affixed to the bulk container or dispenser in the same manner as
> the label, and in a readily visible location…. **Instructions as to the proper
> insertion or placement of the device.**

(Emphasis added).

5

**C. Aearo's Test Results for the Combat Arms™ Earplugs Demonstrated the Need for a Warning and Special Fitting Instructions**

21. The NRR is supposed to represent the amount of sound attenuation experienced by a test group under conditions specified by the federal Noise Control Act's testing methodology.

22. In or around January 2000, Aearo began NRR testing on each end of the Combat Arms™ earplug. Rather than use an independent test lab, Aearo performed its testing in-house at its E-A-RCAL laboratory (also now owned by 3M). Aearo selected 10 test subjects, including some of its own employees. Aearo's test protocol involved testing: (1) the subject's hearing without an earplug; (2) the subject's hearing with the open/unblocked (yellow) end of the Combat Arms™ earplug inserted; and (3) the subject's hearing with the closed/blocked (green) end of the Combat Arms™ earplug inserted.

23. Aearo's own employees monitored the test results as the tests were performed, which allowed them to stop the testing at any point if they were not achieving the desired NRR. This violated the ANSI S3.19-1974 testing protocol. In fact, Aearo stopped the test of the green end of the Combat Arms™ earplug inserted after only 8 of the 10 subjects had been tested. At that point, the Combat Arms™ earplugs were failing expectations miserably. Aearo was expecting to achieve an NRR of 22 with the green end inserted, but in fact was on target to receive a 10.9 rating based on the experiences of the first eight subjects.

6

24. Despite stopping the test on the green end of the Combat Arms™ earplugs, Aearo had the remaining two test subjects complete the test with respect to the yellow end of the Combat Arms™ earplugs only because Aearo liked the low NRR rating the test was indicating to that point. After completion, however, testing of the yellow end resulted in an NRR of -2, which falsely suggested that the earplugs actually amplified sound. Aearo thus knew that the test was inaccurate and needed to be repeated. Instead, Aearo changed the -2 NRR to a 0 NRR, and used that rating on its labels.

25. After prematurely stopping the NRR test of the green end of the Combat Arms™ earplug, Aearo investigated the disappointing test results and discovered that because the stem of the earplug was so short, it was difficult to insert the earplug deep enough into the wearer's ear canal to obtain a proper fit as required by ANSI S3.19-1974, Section 3.2.3. *See*, Acoustical Society of America Standard Method for the Measurement of Real-Ear Protection of Hearing Protectors and Physical Attenuation of Earmuffs (ASA STD 1-1975).

26. Aearo also discovered that when the green end of the Combat Arms™ earplug was inserted into the ear using the standard fitting instructions, the basal edge of the third flange of the yellow end pressed against the wearer's ear and folded backward. When the inward pressure of the earplug was released, the yellow flanges tended to return to their original shape, thereby loosening the earplug, often imperceptibly to the wearer. And,

because the Combat Arms™ earplug was symmetrical, this same problem occurred when the earplug was reversed.

27. Aearo later instructed test subjects to fold the flanges on the non-inserted end of the earplug back before inserting it into the ear.

28. Using these manipulated fitting instructions, Aearo re-tested the green end of the Combat Arms™ earplugs starting in February 2000. During this re-test of the green end, test subjects folded back the yellow flanges of the earplug (essentially elongating the too-short stem) to allow them to insert the earplugs deeper into their ears to obtain a proper fit. Because the yellow flanges were folded back, the basal edge of the third flange no longer pressed against the subject's ear canal, and thus did not cause the earplug to loosen during the testing. Using this manipulated test protocol, Aearo achieved a 22 NRR on the green end of the Combat Arms™ earplug.

29. Due to the symmetrical nature of the Combat Arms™ earplugs, the problem that affected the fit of the green end similarly affected the fit of the yellow end. The fact that Aearo's testing of the yellow end resulted in a -2 NRR meant that the earplugs (when used without the special instructions described above) did not provide a proper fit (as required by ANSI S3.19-1974, Section 3.2.3) between the ear canal of at least some of the subjects and the earplugs. As a result, some subjects had large standard deviations across trials on the yellow end test, which suppressed the NRR rating.

8

30. Nevertheless, Aearo did not re-test the yellow end using the manipulated fitting instructions like it did on the green end, i.e., folding back the flanges on the green end of the earplug before inserting the yellow end into the ear.

31. Aearo did not re-test the yellow end because it knew that it would not be able to obtain a 0 NRR (much less the facially invalid -2 NRR).

32. Moreover, the need for the special fitting instructions for the Combat Arms™ earplugs is more important during real-life use than in a lab where the NRR tests are performed over the span of just a few minutes and the head of the test subject remains virtually motionless during the test. Wearers, such as Plaintiff on the other hand, may wear the earplug for an extended period of time and are more active than test subjects in a lab.

33. Because the issue was imperceptible to the wearer, an improper fit would go undetected by those who wore them.

34. Defendants continued to sell the Combat Arms™ earplugs until 2016, at which time Defendants discontinued the earplug. *See* Discontinuation: 3M Combat Arms Earplugs Version 2 (Nov. 17, 2015)).

35. Defendants' failure to warn about the need for special fitting instructions for the Combat Arms™ earplugs caused Plaintiff to suffer hearing loss.

36. At all times after 3M's acquisition of Aearo, 3M knew of, conspired with, and was complicit in Aearo's wrongful acts in marketing and selling the Combat Arms™ earplugs without warning of the need for modified fitting instructions.

TOLLING OF STATUTES OF LIMITATIONS

37. Plaintiff could not, by the exercise of reasonable diligence, have discovered Defendants' wrongful acts as the cause of his injuries at an earlier time, because, at the time of these injuries, the cause was unknown to Plaintiff. Plaintiff did not suspect, nor did Plaintiff have reason to suspect, the cause of these injuries, or the tortious nature of the conduct causing these injuries, until less than the applicable limitations period prior to the filing of this action.

38. Further, the running of the statute of limitations has been tolled by reason of Defendants' fraudulent concealment. Through their affirmative misrepresentations and omissions, Defendants actively concealed from Plaintiff the risks associated with use of the Combat Arms™ earplugs without adhering to the specific fitting instructions discussed above.

39. Because of Defendants' failure to warn, Plaintiff were unaware, and could not reasonably know or have learned through reasonable diligence that he had been exposed to the risks alleged herein, and that those risks were the direct and proximate result of Defendants' acts and omissions.

40. Through Defendants' affirmative misrepresentations and omissions pertaining to the safety and efficacy of the Combat Arms™ earplugs, Plaintiff was prevented from discovering this information sooner because Defendants misrepresented and continued to misrepresent the risks associated with using the Combat Arms™ earplugs without adhering to the specific fitting instructions discussed above.

## COUNT I: PRODUCT LIABILITY – FAILURE TO WARN

41. Plaintiff incorporates by reference the paragraphs above as if fully set forth herein.

42. Defendants are the manufacturers and sellers of the Combat Arms™ earplugs.

43. The Combat Arms™ earplugs that Defendants manufactured, distributed, and sold lacked adequate warnings, instructions, or labels at the time they left Defendants' control.

44. Defendants failed to warn, failed to provide instructions, and failed to provide an adequate label that included the modified fitting instructions necessary for the Combat Arms™ earplug to fit correctly in the wearer's ear and create the seal necessary to block out damaging sounds.

45. Defendants had a duty to sell the Combat Arms™ earplugs with reasonable and due care for the safety and well-being of wearers, including Plaintiff. Defendants breached that duty.

11

46. Defendants had a duty to provide adequate warnings and/or instructions to prevent the risks associated with the Combat Arms™ earplugs when worn in the ordinary course. Defendants breached that duty.

47. It was foreseeable to Defendants that the Combat Arms™ earplugs would be unreasonably dangerous if distributed without a warning regarding the risks of damage to the ear with an improper fit and/or modified fitting instructions.

48. Not only was it foreseeable, it was foreseen by Defendants. During testing, Defendants discovered that because the stem of the earplug was so short, it was difficult to insert the earplug deep enough into the wearer's ear canal to obtain a proper fit.

49. Defendants also discovered that when the green end of the Combat Arms™ earplug was inserted into the ear using the standard fitting instructions, the basal edge of the third flange of the yellow end pressed against the wearer's ear and folded backward. When the inward pressure of the earplug was released, the yellow flanges tended to return to their original shape, thereby loosening the earplug, often imperceptibly to the wearer. And, because the Combat Arms™ earplug was symmetrical, this same problem occurred when the earplug was reversed.

50. Defendants had a post-sale duty to warn of the above alleged product-related risks because Defendants knew or reasonably should have known that the Combat Arms™ earplug posed a substantial risk of harm to wearers, including Plaintiff, if used without adhering to specific fitting instructions; the wearer who used the Combat Arms™ earplug

12

can reasonably be assumed to be unaware of the risk of harm of using the Combat Arms™ earplugs without specific fitting instructions because the above alleged loosening effect was imperceptible; a warning or instruction showing how to correctly and safely use the Combat Arms™ earplug could have been effectively communicated to and acted upon by the wearer to whom a warning or instruction might be provided; and the risk of harm, including but not limited to hearing loss in wearers, is sufficiently great to justify the slight burden of providing a warning or instruction. Defendants breached this duty by failing to provide a post-sale warning or instruction.

51. The Combat Arms™ earplugs contained no warnings, or in the alternative, inadequate warnings and/or instructions, as to the risk that the Combat Arms™ earplugs would allow damaging sounds to bypass the earplug thereby posing a serious risk to Plaintiff's hearing unbeknownst to Plaintiff.

52. The warnings and instructions that accompanied the Combat Arms™ earplugs failed to provide the level of information that an ordinary wearer would expect when using the Combat Arms™ earplugs in a manner reasonably foreseeable to Defendants.

53. Had Plaintiff received a proper or adequate warning as to the risks associated with the use of the Combat Arms™ earplugs in the manner contemplated by Defendants, he would not have used them.

54. Additionally, and/or alternatively, had Plaintiff received the modified fitting instructions that were used by Defendants during the testing, which were not disclosed

13

to Plaintiff, Plaintiff would have followed the modified fitting instructions to ensure a proper seal to prevent damaging sounds from entering the ear canal.

55. Plaintiff suffered injury and damage as a direct and proximate result of Defendants' failures to warn and/or provide adequate instructions regarding the dangerous condition of the Combat Arms™ earplugs that the Defendants manufactured, distributed, and sold.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff requests from Defendants, jointly and severally, compensatory damages, together with appropriate equitable relief, costs and attorneys' fees as follows:

A.  Award of monetary damages, including compensatory relief, to which Plaintiff is entitled at the time of trial in an amount exceeding $50,000.

B.  Award of pre- and post-judgment interest.

C.  Award of costs.

D.  Award of all such other and further relief as may be available at law or equity and may be proper under the circumstances.

## DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury on all issues so triable.

## ACKNOWLEDGMENT

The undersigned acknowledge sanctions may be imposed under Minn. Stat. § 549.211.

Dated: 03/15/2022

Respectfully Submitted,

**SCHWEBEL GOETZ & SIEBEN, P.A.**

*/s/ Alicia N. Sieben*

William R. Sieben (#100808)

Alicia N. Sieben (#389640)

Matthew J. Barber (#397240)

5120 IDS Center

80 South Eighth Street

Minneapolis, Minnesota 55402-2246

Telephone:  612-377-7777

Fax: 612-333-6311

bsieben@schwebel.com

asieben@schwebel.com

mbarber@schwebel.com

**PAUL LLP**

Richard M. Paul III (*pro hac forthcoming*)

Ashlea G. Schwarz (*pro hac forthcoming*)

601 Walnut Street, Suite 300

Kansas City, Missouri 64106

Telephone: (816) 984-8100

Rick@PaulLLP.com

Ashlea@PaulLLP.com

**GUSTAFSON GLUEK PLLC**

Daniel E. Gustafson (#202241)

Amanda M. Williams (#341691)

120 South 6th Street, Suite 2600

Minneapolis, Minnesota 54402

Phone: 612-333-8844

dgustafson@gustafsongluek.com

awilliams@gustafsongluek.com

**ATTORNEYS FOR PLAINTIFF**

15